take the appeal under advisement. We'll call argument in the next case Fujifilm Corporation, appeal 1487 from 2009. Mr. Peterson, it looks like the howitzers have all been in place, so let's begin. Good afternoon to you and welcome to the court. Please proceed. Thank you, your honor. The lower court in this case erred by holding that the Fuji patents in our client's cameras had not been exhausted by virtue of their first sale, even if that first sale occurred abroad. Isn't it the case that jury instructions and verdict forms contained the agreement of the parties that there was a 60-40 split between those cameras that had been sold in the U.S. and those that had not previously been sold in the U.S.? There was no agreement of the parties, your honor. There was prior finding in a different case in which our clients politicized the parties. No, no, no. Isn't it the case that there was a jury instruction incorporating the 60-40 to which you did not object? It would not matter for the purposes of the argument we're making here. Wait a minute. First answer the question. Did you object to the jury instruction and the verdict form, each of which contained the 60-40 assumption? We did not because it had been the subject of a prior in limine ruling by the court. There would have been no purpose to raising a specific objection in the jury instruction and the Third Circuit rules do not so require. There was an in limine motion with respect to the 60-40 split? Yes, there had been a motion filed to preclude, well, to preclude testimony regarding a couple of issues in the case. One of the issues that had been precluded was the question of permissible repair. Permissible repair was, the court has held, had been previously adjudicated in a case which Fuji litigated on these same cameras. In that case, the bankruptcy court, on the basis of different evidence, said there was a 60-40 split with regard to a certain period of cameras, so that with respect to that period of cameras, which were only part of the cameras involved in this case, the prior court had said 60% of those cameras were sold in the United States, 40% had not been sold in the United States. Then there's a colloquy between Judge Hayden and counsel, and she says, Fuji's counsel sent me a letter saying that all defendants and Fuji agree that the 60-40 split covers the later two periods as well, and you didn't say, no, no, we don't agree to that. No, no, not correct, Your Honor. There had been, at some point, there had been a discussion. Was there going to be a trade-off, or was there going to be a stipulation? Would Fuji agree to drop the first sale issue if we would agree to accept the 60-40 split? No such agreement was ever reached, and as you will see, because no agreement was ever reached, you'll find no stipulation in the record to that effect. And in fact, you will find a ruling by Judge Hayden where she specifically holds, on the basis of the motion we filed, that Fuji was to be stopped from relitigating the question of permissible repair. So there was no agreement of the parties on that point. It remained a contested point. Well, the transcript reads with her referring to a mail letter from Fuji. She then asks Fuji's counsel if it is still the case that, as the letter asserted, all defendants agreed to be bound by the 60-40 split. And Fuji's counsel then tells Judge Hayden, nothing has changed. Nothing has changed, meaning no agreement had been made. But the premise was that you were willing to stipulate the 60-40, and Fuji's counsel so maintained to Judge Hayden in response to her question, and your side didn't say anything. Well, that had been in conjunction with a stipulation which would have eliminated the first sale issue. That stipulation was never reached, and as you see, Judge Hayden had to reach a decision, which she did, on that contested question. She held that Polytech, that rather Fuji was collaterally stopped from relitigating the permissible repair issue. So in that case, then she sua sponte went on to say, and we would be precluded from relitigating the 60-40 split for those transplant cameras, based on the decision of the Bankruptcy Court in which our client Polytech had not been a defendant and which client Jazz Products had not been a defendant. But the defendants never agreed to that split. And what Fuji represents as being an agreement or stipulation of the parties never occurred. And I think they're taking some of the comments before the court out of context in that regard when they say that there had been some stipulation. The notion that there had been a stipulation or an agreement by us on that point is belied by the fact that Judge Hayden had to deliver from the bench a decision on the collateral estoppel motion. It wouldn't have been necessary if an agreement had been reached. So I believe Fuji is quoting that out of context. But the more important point is this. Regardless of how you would handle the 40-60 split, the fact of the matter is, following the Supreme Court's decision in Quantum Computer versus LG Electronics, it would not matter where the first sale of these cameras occurred. In Quantum Computer, the Supreme Court set out a two-step rule for exhaustion of a patent. Are you talking about footnote 6? Pardon? Are you talking about footnote 6? Well, that's part of the analysis in footnote 6. But footnote 6 didn't have anything to do with foreign versus domestic. Yes, it did, Your Honor. It actually undercut the reasoning of this court in its 2001 decision in Jazz Photo Corp versus the USITC. How did it undercut that decision? It had nothing to do with foreign sales. It was talking about whether there was a sale of a component that might have substantial non-infringing use. This is a completely different issue. Well, the notion that was advanced by this court in Jazz versus ITC is stated as follows. It says, to invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent. They said that in that case, and they quoted the Bosch versus Graf case. So, now what was said in footnote 6 in Quantum Computer is that the question is whether the product is capable of use in practicing the patent, not whether those uses are infringing. The Supreme Court is talking about whether the decision that was made in the earlier Univis case had a bearing in the Quanta case. It's all talking about the sales of component parts and contingent liabilities associated with that, a contributory infringement sort of contest, but not the question that was addressed earlier with respect to foreign exhaustion. Well, if I could complete the quotation from footnote 6. You can go ahead and quote it, but this is something I complain frequently about. Parties are doing site bites, finding snippets of interesting language and taking them completely out of context. What they went on to say is they said, whether outside the country or functioning as replacement parts, the Intel products would still be practicing the patent, even if not infringing it. Right, and that's certainly relevant to the question of whether there was a substantial non-infringing use of the sale of a component. Right, but it goes to the question of whether the sale abroad has to be done under the United States patent in order for exhaustion to attach. This Court suggested that only a sale that occurs under the United States patent can lead to exhaustion. I don't think we suggested that. I think we held that, and I think this panel has no authority to overrule that precedent, even if we were persuaded by your argument. Well, again, Your Honor, if you're persuaded by the argument, you do have the authority to overrule without going to an on-bank panel. We don't. You're just flat wrong about that. Under rule, we have to follow the prior panel decision unless we go involved. Well, under the very first decision that this Court issued when it was constituted as the Federal Circuit, the South Corporation v. the U.S. case, this Court said, and I quote, earlier decisions prevail unless overruled by the Court on-bank or by other controlling authorities, such as intervening statutory change or Supreme Court decision. So, you know, the very fundamental first decision of this Court indicates that on-bank is not the only way that a prior panel decision can be overruled, and it can be overturned if there's been an intervening Supreme Court decision. Now, the Court may or may not be persuaded that in quanta computer there was an articulation of a point, but the fact of the matter is if you are persuaded, then this panel does have the authority to overturn that decision. When one looks at the quanta decision, what we see is that the Court is not really laying any new ground with the question of exhaustion. It's saying there's two requirements. There must be an authorized sale, and in this case, every Fuji sale was authorized. It was made either by Fuji or by one of Fuji's licensees under worldwide licenses. And the second requirement is that the inventions had to substantially embody the patent, not even a question. Does your case depend on our accepting your argument that the Supreme Court implicitly overruled the earlier decisions involving jazz foot? Not in whole. Obviously, if you agree with that, then all of the other points become unimportant because basically the entire… was actually secretly deciding that issue anyway. Well, one thing I would point before leaving that issue is that the Supreme Court has never accepted or articulated the notion that a foreign sale cannot exhaust a patent. And it's erroneous to assume that the Supreme Court somehow acknowledged or accepted this Court's series of prior decisions in jazz. They never did. They repeated that since universe. The question is whether they overruled it, not whether they adopted it. They don't have to overrule it. I mean, once the Supreme Court speaks, they don't catalog every inferior or subordinate court decision that may be inconsistent with their decision. It remains to the lower courts to do that. We pointed to the case of LG versus Hitachi where we believe Judge Wilkin did that correctly. We believe Judge Hayden did it incorrectly here. With respect to the question of the amount of damages, we'll just rest on what's in the brief. I do want to speak very briefly about the contempt citation that was visited on our clients for supposedly violating an order, preliminary injunction against the importation of infringing cameras. We previously filed a separate appeal on this issue, but it was dismissed as premature. Basically, though, as we've explained in our briefs, there was not clear and convincing evidence of an infringement sufficient to support a contempt finding. The contempt finding was based almost entirely on unsworn testimony presented by Fuji. The statements claimed that the full back replacement of cameras infringed their patents. It's a position that this Court rejected in 2007. In the case of all of the cameras that our client reimported at that time, the patents had effectively been extinguished by a bankruptcy court sale, which had given them to our clients in purchasers in good faith, free and clear of any encumbrances. Without the possibility of actual infringement as to those cameras, and in fact the final judgment shows no evidence relating to any of those shipments, we submit that there is no clear and convincing evidence sufficient to support that contempt citation. If you want to retain the last two minutes, I would like to retain it for rebuttal. Thank you, Mr. Peterson. Mr. Rosenthal? Your Honors, I apologize, but I can't create the same excitement as the first argument, and apparently the last one will create. I feel like I'm a book in the middle of a pair of bookshelves. Don't worry about that. We're not interested in excitement. We're interested in deciding cases correctly, so we'd like your help on deciding this one correctly. Your Honor, let me follow the order of Mr. Peterson. On the estoppel issue, Your Honor pointed precisely to what happened on the May 18th hearing. You have to go back to April 8th, though, when the court had in front of it only one in limine motion directed to the permissible repair defense, and that was whether Fuji could maintain the process prong of the permissible repair defense, and ultimately the court granted that in limine motion against Fuji. But at that time, and I think in the exercise of the teachings of Rule 56D1, the court, in essence, issued an order to show cause. Fuji, you show what evidence you're going to put forward that wasn't in front of Judge Stern on the process issue. Defendants, you show me what you're going to put forward on the 2003 first sale issue. And there was no motion on the 2003 first sale issue. This was the judge, sua sponte, as was observed, but exercising the power that she has under 56D1 to control what happens in her courtroom, to save judicial time and the jury. She was very concerned about wasting the jury's time. So we advance now to May 15th. Both sides put in their proffers. Fuji puts in extensive proffers on the 6040 factual statements and evidence and documentary evidence. All we get from the defendants are I'm going to rely on what I did before, and it's a matter of, how shall I say, I don't need direct evidence. I can use circumstantial evidence, and I'm going to assume the circumstantial evidence is going to do it. Now, what the judge did on May 18th is she took all of these proofs. She considered them. She ruled against Fuji on the one eliminate motion that was directed to repair versus reconstruction. She reserved the eliminate motion directed to all the prior proceedings to be dealt with second rather than first. And she said, well, I want to, because this issue was litigated between Bannon and Fuji extensively in the bankruptcy court, 24 days of trial, appeals to this court, at that point, I don't think there's anything more, and I'm going to preclude proofs on that 6040, and I'm going to accept the 6040 split of Judge Stern. As to tranche one or as to all three time periods? No, just, not even, only for tranche one. For tranche two and three, which is the period in 2004 through 2008, she said, put your proofs, the jury will decide, and the jury did decide. All the findings of infringement are based on first sale. So, at that point, if defendants wanted to alert the court that there was something wrong, and I observed quite promptly, and I will defend it, that there was an agreement, a stipulation, they had to stand up and be counted, but they didn't. And Judge Hayden went on with her, with the trial, with all the proceedings, and, in fact, there was no need or want to have a stipulation at that point, because both ends of the stipulation had been ruled on by the judge. Everything was moved. Now, I'm getting confused. Did they waive, or did she decide so that waiver is irrelevant? Your Honor, I think they consented by their silence, and therefore there was a waiver. And, in addition, she independently decided. I think the order of doing business is she decided they waived. If they disagreed with her on May 18th, their job was to come forward and tell her. Now, when they did tell her post-trial, she said, well, I didn't really mean collateral estoppel because there wasn't a motion for collateral estoppel. I just didn't think there was evidence. I didn't want to waste the jury. So she provided an explanation post-trial in the transcript of July 16. But, nonetheless, there was a waiver. Now, there was a second waiver. Where is this waiver in the transcript? The first waiver is on May 18th at appendix page A288. As you see, Your Honor, it's on page 288, A288. And that's the reference to the letter. That's the reference to the letter. And she asks me, has anything changed since my letter? And the answer is no. There was no answer from Mr. Peterson. He stood moot at that point. So then she concludes, so according to the trial, the sole issue at play would be the amount of shells after December 12, 2003, that was subject to patent exhaustion for a sale, which is what Mr. Peterson has suggested was the only issue for trial back in April. On April 8th, he utters those very words. So, as Your Honor pointed out, thereafter, we had the jury instructions and we had the verdict form, which clearly and unequivocally memorialized this decision. And they were accepted without objection. We negotiated them in front of the judge the night before. The final terms of jury instruction, final terms of the verdict form, no objection. So the objection first arises in a post-trial motion, I guess a 50B motion, after the jury has rendered its verdict. I thought there was no JMOL in this case. There was no JMOL 50A, the pretrial, other than on an achiever issue, which doesn't exist anymore. That's gone. Post-trial, they put forward a JMOL seeking a new trial for damages issue. Not the same thing. Not the same thing. Asking for a new trial and asking for judgment as a matter of law, not the same thing. Not the same thing. They did ask for a judgment as a matter of law as to quanta in a July post-trial filing. But they never mentioned this issue of estoppel, what I call the estoppel issue. If I understand Mr. Peterson, he's saying that they had litigated it pretrial and there is case law saying you don't have to keep making repetitive objections if something has been clearly decided adverse to you by the judge in some pretrial stage. Your Honor, I'm familiar with that law. I think Rule 46 deals with that because what that rule says is you don't have to raise exceptions to every ruling provided you tell the court what your objection is, provided you tell the court the bases and that you object. Nowhere in this record can you find Mr. Peterson telling the court that he objects. It's just not there. It's not in his submittal to the order to show cause. It's not anywhere. This is deadly silence. So I think— Was there a motion in limine relating to the foreign sale issue? No. There was a letter motion at the beginning of the case making the quanta argument that quanta overruled sub salento. Even if that's not technically a motion in limine, isn't that enough to apprise the court that the issue is contested? No. All that that apprises the court is that the whole first sale issue is contested, not that the period from April to December 12, 2003 is being contested. I agree. But my point is with respect to the entirety of the issue. The issue of the foreign sale, the exhaustion issue, that that's what I'm getting. Yes. That was at least before the court, and the court was aware of that issue and even characterized that as being sort of renewed at the end of the case. That's correct, Your Honor. The district court disposed of it on the first day and considered it renewed at the end and disposed of it again. And quite correctly, I submit, because there is nothing in quanta that sub salento or otherwise overrules Jazz v. ITC. Before your time runs out, I'd like you to address the damages issue in this case. Because the jury awarded a $2 running royalty, right? Yes, Your Honor. Which was considerably more than the highest royalty you requested, right? No, that's not true, Your Honor, if I could address that. First of all, I think the… Fill me in on what went on with the damages and why you think the jury's award is not excessive. Just as a threshold, I think I4I puts this question to bed because there was no motion brought prior to the jury entering into deliberations to contest the sufficiency of the evidence. The evidence that was adduced at trial, first of all, consisted of the testimony of Mr. Nishibe of Fuji Japan about their licensing policies and how they would not normally want to license Benin or these companies because they were risky, they were disreputable, they were selling products that they were unhappy with. But if forced to issue a license, they would ask for $1 for every camera under the theory that you can't tell which are infringing and which are not infringing because they come in these opaque boxes and you can't segregate using a shell of foreign origin. Mr. Burhey of Fuji USA testified as to the injury that the company suffered as a result of the competition of these reloaded cameras. They were dragging the price down. Fuji had to lower its prices to meet this competition and he wanted, again, $1 because he wanted to drive their costs up so maybe their price would stay up. But no expert testified that the reasonable royalty should have been $2. Actually, he did, Your Honor. Mr. Carter testified that the proper royalty was $0.40 per camera under the theory that segregation was impossible. He then went on to testify that if the royalty were assigned on a per-infringing camera basis, the jury could scale that up to a higher royalty rate to achieve the same result. And what happened... So the reasonable royalty would have been $0.40 per camera regardless of infringement? Regardless of infringement. Because you couldn't tell. It was impossible to segregate. It was impossible to segregate. They couldn't do business unless they had a license from Fuji. All of the defendants would have pooled their respective profits, which totaled, the expert came out at $0.74, which put an $18.2 million pot. The jury came out with a pot when you add up all the constituents at about $11. Now, I didn't see any evidence in opposition to this evidence from the other side. That's correct, Your Honor. So I didn't miss anything. You didn't miss anything. They didn't have an expert. They didn't put a facts witness who was going to testify as to what the royalty would be, although Mr. Benin did testify. Ms. Zito, representing Polytech, testified. But there was no testimony whatsoever on the damages issue. You're telling us that Carter, your expert, testified that the royalty per infringing camera would be $2? No. The question the gentleman asked you is whether any witness… No, he got there, Your Honor, if I may explain. He says $0.40 per total camera. I heard that. So if you decide that only one in five of the cameras are infringing, then the royalty would be $2 a camera of infringing cameras. Why is it proper to conclude that $0.40 for all cameras is a reasonable royalty when obviously you're only entitled to a reasonable royalty on infringing cameras? Well, his theory was that they had no way of segregating, and so the reasonableness of the royalty was based on a negotiation that took into consideration the entire profit pool of the defendants and their need for a license and the expectation that if they had taken a license, it would have raised their fees. You're saying the entire profit pool. You're saying they came up with some idea that we ought to extract X amount of dollars from these defendants and then we can reverse engineer whatever the royalty should be on the infringing products compared to all of their products to come up with that same number? No, Your Honor. His analysis of the $0.40 per camera was based on the Georgia-Pacific factors. He took all the Georgia-Pacific factors, analyzed them, those up, those down, came up, took the profits that the defendant pool had, and came up with $0.40. So the base would not be $0.40 times the total number of cameras. The base would be $0.40 times the infringing cameras. That's not his testimony. His testimony was that if we were going to do it on the basis of a negotiation because of the need for a license, the inability to segregate, they'd have to go out of business without a Fuji license. They would be compelled to pay a royalty on every product because they couldn't segregate. On every product, infringing or not. Infringing or not, but it came out in the wash because it would be a higher royalty if you counted only the infringing products. But again, just to finish the point and then I'll be quiet. What I'm trying to get at is whether the $0.40 per camera number is the hypothetically appropriate reasonable royalty for infringing units or that $0.40 per camera is a number that would apply to all cameras sold, of which some of them might be infringing, some of them might not be infringing. We can't tell the difference. That's correct, Your Honor. But the jury was told that they could scale the $0.40 up and they ultimately found about 18.2% of the total cameras were infringing. But that theory suggests that the reasonable royalty could be considerably higher than $0.40 a camera. Yes. The expert, Mr. Carter, so testified. All right. Thank you. Mr. Peterson, you have two minutes for rebuttal. Two points. First, speaking to the question of damages, Mr. Carter's testimony that it would be impossible to segregate infringing from non-infringing cameras is simply incorrect. The trial record indicated that we had this manufacturing license number system which allowed people to segregate cameras by their source of purchase. Now, in 2006, this court, Ervin Peel from the Court of International Trade, involving the same system and involving the same cameras, upheld the decision of the CIT that, yes, we could segregate. And we, in that case, did in fact segregate. So when the damage witness says segregation was impossible, it's not true. And their damages witness also testified that he thought the cost of segregating would be $0.02 per camera. So even if you were going to give that witness's testimony full credit, the fact of the matter is that perhaps the infringing cost should be $0.40 plus $0.02 per camera for the segregation cost. Did you put forth any evidence whatsoever with respect to what the reasonable royalty should be? Well, Your Honor, at the beginning of this case, Judge Hayden issued an order arresting all the defendants. It's a simple question, yes or no. Yes, well, yes, Your Honor. As Mr. Rosenthal indicated, we did have testimony of Mr. Bennett. We also had the testimony of the Fuji witnesses. On damages? On damages and what a reasonable royalty would be because in evidence are all of the other worldwide royalty agreements. And what you see from them is, in some cases, they're cross-licensed for free. In some cases, they're licensed for $0.02 or $0.03 a camera. I think the highest per-camera license that Fuji entered into was $0.15 a camera. But now their witness comes in and look at what's happening here. The jury agrees, yeah, very few of the cameras that they made a decision on were infringing. Most of them were proven to be sold in the United States, if that's your lodestar. But the witness is saying, no, we want the royalty base to include everything. Cameras that are non-infringing and cameras that we at Fuji have already been paid for. And that's the real abuse here. That's what the problem is going to be if you uphold this kind of activity because they didn't just say, give us a few cents if you can't prove that the goods were sold in the United States. They said, let's expand this royalty to every camera, infringing and non-infringing, with full knowledge that Fuji had already been compensated through their royalties or through their sale price for every single camera in this case. Now, you're saying that there was testimony on this? Mr. Benin testified? Mr. Benin testified as to what he thought the value was and what his profits were. But if you take a look at the range of Fuji's own witnesses' testimony as to what a reasonable royalty is and what other courts have found a reasonable royalty to be for these patents, you're looking at a range of anywhere from a penny or two to 56 cents a camera. Not the $2 a camera this jury came back with. I'm going to tell you about Fuji's witnesses. Any other witness other than Mr. Benin? We were unable to afford an expert witness because the funds had been arrested and we didn't have the wherewithal to hire him. And where would I find the testimony that you're referring to for Mr. Benin? Mr. Benin's testimony is in the transcript. And mostly, though, the important thing is Mr. Benin... Is it in the appendix that you have? I believe it is. I don't have the page to hand, but I will refer it to the court. All right. If I could just make one final comment in that regard, Your Honor, Judge Lin's comment about Quanta and the idea that we're diving for a site. We're not. Quanta sets out what I presume to be a complete theory of patent exhaustion with two requirements, one requirement being substantial rebuttal and one being... This isn't proper rebuttal. There was no argument by Mr. Rosenthal about Quanta. We'll rest on the black and white side, Your Honor. All right. Thank you both. The appeal is submitted.